IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **PORFIRIO R. BARNES,** | ) | Civil Action No. 7:12-cv-00067 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **S.K. YOUNG,** *et al.*, | ) | By:  Norman K. Moon |
| Defendants. | ) | United States District Judge |

Porfirio R. Barnes, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983.  Barnes claims that defendants violated his rights under the Eighth Amendment of the United States Constitution, Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("RA").  Defendants Health Services Director Fred Schilling ("Director"), Warden S.K. Young, Assistant Warden S. Meek, and former Unit Manager E.A. Eaton (hereinafter "Defendants") have filed a motion for summary judgment, to which Barnes has responded.  Defendants Gerard T. Hopkins, M.D., Sue Yates, R.N.C.B., and Angela Osborne, L.P.N., (hereinafter "Medical Defendants") have filed a separate motion for summary judgment, to which Barnes has responded.[1]  Upon consideration of this action, I find that the defendants' motions for summary judgment should be granted.[2]

### I. Background

Barnes alleges that he was diagnosed with lumbar spinal stenosis and suffers from back pain, leg pain, weakness, and difficulty walking.  Barnes claims that he needs a walker to move

---

[1] The Medical Defendants previously submitted a motion to dismiss, which I granted in part and denied in part by order entered March 18, 2013.  I granted the motion to dismiss regarding Barnes' ADA and Rehabilitation claims against Dr. Hopkins but denied it as to Barnes' retaliation and Eighth Amendment claims.  Thereafter, I directed these defendants to file a motion for summary judgment.

[2] Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment for the defendant is appropriate when no genuine issues of material fact exist and where the moving party is entitled to a judgment as a matter of law.

around and that a cane is not sufficient. He states that upon his arrival at Pocahontas State Correctional Center ("Pocahontas") on March 2, 2010, where the events pertinent to this lawsuit occurred, he possessed a walker and cane to assist him in ambulating.[3] Barnes states that the Virginia Department of Corrections previously approved both these mobility aids, which were prescribed to him by "institutional doctors who specialize in spinal disorders and back diseases."[4] (Docket No. 1, p. 4) However, upon entering Pocahontas, Barnes was placed in medical housing, allegedly because his walker and cane were not allowed in general population. In his response to Defendants' motion for summary judgment, Barnes states that he was held in medical segregation until a doctor could assess his condition, "solely because he require[d] the use of medical mobility aids." (Docket No. 37, p. 2) While in medical housing, Barnes states he did not have access to certain privileges available to general population inmates, including commissary, dining hall, outside recreational fields, indoor gymnasium, prison jobs, religious services, treatment and educational programs, television, and microwave ovens.

While in medical housing, Barnes' walker was confiscated as unauthorized. (Docket No. 1, p. 4) On March 7, 2010, Barnes filed an emergency grievance seeking the return of his walker "because [his] legs had weakened to the point where they could barely support [his] weight . . ." and his walker was returned to him that same night. (Docket No. 1, p. 8) Following his evaluation by Dr. Hopkins on March 10, 2010, prison officials released Barnes from medical

---

[3] Barnes was transferred out of Pocahontas on January 28, 2011.

[4] In their motion for summary judgment, Medical Defendants assert that, at the time of Barnes' transfer to Pocahontas, he did not have a current Order for either a cane or a walker. His previous Order for a walker, issued by Coffeewood Correctional Center, had expired. (Aff. Nurse Yates ¶ 6, Docket 50-1, p. 1)

housing and assigned him to general population.[5] Upon transfer into general population, Barnes was denied his walker but was allowed to have his cane.

Barnes was assigned a job as an assistant pushing another inmate in a wheelchair ("inmate pusher"), and claims he used the other inmate's wheelchair as a makeshift walker to help him ambulate throughout the facility. On June 10, 2010, an MRI of Barnes' lumbar spine, ordered by Dr. Hopkins, showed degenerative changes, disk bulging, and mild central canal stenosis.

Barnes states that, shortly after his assignment to general population, he began to "experience extreme pain in [his] lower back and legs due to the uneven pressure being placed on [his] spine from walking to and from the pill window and the mess hall," causing Barnes to periodically miss meals and medication. Barnes claims he missed his mental health medication "for much of the month of August 2010." (Docket No. 1, p. 9) He also claims that between September 21, 2010 and October 31, 2010 he suffered several "hypoglycemic attacks" due to lack of proper meals and medication." (Docket No. 57, p. 5)

On September 10, 2010, Barnes filed a grievance against Nurse Osborne for refusing to issue him medication that he could self-administer. Barnes claims that in response to the grievance, Nurse Osborne called Barnes to the medical unit and "issued threats to get even with [him]." Three days later, Barnes filed two more grievances against Nurse Osborne, one for threatening to make him "suffer" by having him removed from his inmate assistant job, and one for cursing, yelling, and telling him that she "didn't care if [he] crawled around the compound but she was having the wheelchair removed." (Docket No. 1, p. 15) On September 15, 2010, an unnamed individual reported to Nurse Osborne that Barnes was being pushed in a wheelchair by

---

[5] Barnes states he was released from medical housing "on or about" March 9, 2010. (Docket No. 1, p. 8)

the inmate he was assigned to push, after Barnes had succumbed to the pain in his lower back. Thereafter, on September 17, 2010, Barnes claims that Nurse Osborne had Barnes removed from his inmate pusher job in "direct retaliation" to him "exercising his constitutional rights to seek relief from her abuse and harassment." (Docket No. 1, p. 15)

Barnes states that on October 29, 2010, he met with Assistant Warden Meek, Unit Manager Eaton, and Nurse Yates to discuss his inability to ambulate throughout the facility. Barnes claims that Nurse Yates insisted Barnes was not sick and refused to transfer him to medical housing. Allegedly, Barnes explained that his inability to ambulate meant that he had no way to receive his medication or food, and that "having to beg other inmates for food exposed [him] to sexual predators and extortionists." (Docket 1, p. 12) However, defendants told him he would have to wait six days to see Dr. Hopkins before he could be approved for a wheelchair.

On November 3, 2010, Dr. Hopkins granted Barnes permission to use a wheelchair for one month. (Aff. Dr. Hopkins ¶ 14, Docket 50-2). Once assigned a wheelchair, Barnes complains that Unit Manager Eaton and Assistant Warden Meek denied him an inmate pusher, "a service that . . . every other wheelchair bound inmate . . . enjoyed." (Docket No. 1, p. 13)

## II. ADA and RA Claims Against Defendants

Barnes alleges that Warden Young and Director Schilling violated his rights under Title II of the ADA and Section 504 of the RA. However, these allegations are not sufficient to support a viable claim.

Title II of the ADA and Section 504 of the RA, which apply to inmates in state prisons, provide that "no qualified individual with a disability shall, by reason of such disability, be

4

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C. § 12132; *Pa. Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210–13 (1998). A plaintiff seeking relief under the ADA must present sufficient evidence to establish that 1) he has a disability;[6] 2) he is otherwise qualified to receive the benefits of the public services, programs, or activities; and 3) he was denied the benefits of such services, programs, or activities, on the basis of his disability. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005); *Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999). A successful RA claim requires a showing of discrimination "solely by reason of" disability. 29 U.S.C. § 794(a). *See Constantine*, 411 F.3d at 498 n.17.[7] The Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 362 (4th Cir. 2008).

In support of his ADA and RA claims against Warden Young, Barnes alleges that Young created a policy or custom "banning the use of walkers, crutches, leg braces, etc. in general

---

[6] For purposes of this opinion only, the Court assumes without finding that Barnes could prove that his medical conditions constitute disabilities under the ADA and the RA. The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The RA uses a comparable definition. 29 U.S.C. § 705(9)(B).

[7] The United States Supreme Court has held § 504 of the RA to require "reasonable accommodations" in a particular program or activity receiving federal financial assistance in order to ensure "meaningful access" to the program. *See, e.g., Alexander v. Choate*, 469 U.S. 287, 301 (1985). A plaintiff asserting a claim for denial of a benefit under the RA must prove that he (1) is a qualified individual with a disability, (2) is otherwise qualified for the benefit of programs, services or activities in question, and (3) was excluded from the same due to discrimination on account of that disability. *McIntyre v. Robinson*, 126 F. Supp. 2d 394, 407–08 (D. Md. 2000) (citing *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) (noting that because language and purposes of the Acts are substantially the same, a common analysis applies to claims under ADA and RA)).

population." (Docket No. 1, p. 4).[8] He further alleges that Director Schilling was aware of the "unconstitutional practice of banning walkers." *Id.* at 11. Finally, Barnes claims he was placed in medical segregation upon his arrival at Pocahontas "solely because he require[d] the use of medical mobility aids," where he did not have access to the same privileges as inmates in the general population. (Docket No. 37, p. 2)

Barnes fails to allege facts indicating that defendants discriminated against him on the basis of his disabilities. In fact, for the most part, Barnes admits that defendants accommodated his medical needs. Upon his arrival at Pocahontas on March 2, 2010, Barnes' walker and cane were not on his transfer sheet, and both items were confiscated until he could be evaluated by the facility physician to determine whether a medical need existed for these mobility aids. (Aff. Young ¶ 4, Docket 32-1, p. 2) Thus, the temporary assignment to medical housing at Pocahontas was clearly an accommodation of Barnes' asserted disabilities. His exclusion from certain privileges during his brief stay in medical housing occurred as a natural result of this accommodation and not as a result of discrimination based on his disability. Following examination by Dr. Hopkins on March 10, 2010, Barnes was transferred to general population housing, where he was permitted to use his cane. However, Dr. Hopkins determined that Barnes' did not need a walker. Further, prison officials ultimately provided Barnes with a wheelchair. While Barnes clearly would have preferred a walker to a cane or wheelchair, he has no entitlement under the ADA or the RA to determine precisely the manner in which prison officials choose to accommodate his disabilities. Thus, Barnes has not sufficiently alleged that

---

[8] Barnes also alleges that Warden Young and Director Schilling were aware of his pain and difficulty ambulating without a walker, and were negligent in supervising subordinates who violated his rights. However, these claims do not pertain to any aspect of the ADA or the RA and are more appropriately addressed as claims under the Eighth Amendment.

Warden Young or Director Schilling excluded him from any program "solely by reason of his disability." *See* 29 U.S.C. § 794(a). Accordingly, I will grant Defendants Warden Young and Director Schillings' motion for summary judgment for Barnes claims under the ADA and RA.[9]

### III. Eighth Amendment Claims against Defendants and Medical Defendants

Barnes also alleges that Warden Young, Director Schilling, Assistant Warden Meek, Unit Manager Eaton, Dr. Hopkins, and Nurse Yates were deliberately indifferent to his serious medical needs in violation of his rights under the Eighth Amendment.

To establish an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that jail officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492 (E.D. Va. 1995). Mere negligence does not constitute deliberate indifference; rather, a prison official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The officer's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). A claim concerning a disagreement between an inmate and medical personnel regarding diagnosis or course of treatment does not implicate the Eighth Amendment. *Wright v. Collins*, 766 F.2d 841, 849 (4th

---

[9] In his response to Medical Defendants' motion for summary judgment, Barnes states Nurse Yates also violated his rights under the ADA because she instructed correctional officers to hold him in the medical unit until he could see a doctor, instead of placing him immediately into general population. (Docket No. 57, pp. 2, 14; Docket No. 57, p. 2) Barnes' ADA claim against Nurse Yates fails for the same reasons it fails against Warden Young and Director Schilling.

7

Cir. 1985); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990). Furthermore, questions of medical judgment are not subject to judicial review. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (citing *Shields v. Kunkel*, 442 F.2d 409 (9th Cir. 1971)).

To establish personal liability against a defendant in a § 1983 action, the defendant must be personally involved in the alleged wrong(s); liability cannot be predicated solely under *respondeat superior*. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under § 1983 if the subordinate acted pursuant to an official policy or custom for which he is responsible, *see Fisher v. Washington Metropolitan Area Transit Authority*, 690 F.2d 1133 (4th Cir. 1982), or if the following elements are established: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), cert. denied, 513 U.S. 814 (1994).

"Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." *Id.* "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" *Id.*

### A. Defendants Warden Young and Director Schilling

Barnes does not allege that Warden Young and Director Schilling were personally involved with his medical care. Instead, Barnes claims, without support, that they banned "walkers and other mobility aids in general population." (Docket No. 37, p. 4) Barnes further claims they were "grossly negligent in supervising subordinates." (Docket No. 1, p. 9) However, Barnes makes no allegations in his complaint that support supervisory liability against these defendants. Beyond his conclusory allegations, Barnes has not shown that these defendants banned walkers and other mobility aids in general population.[10] In fact, Barnes admits that, once his cane was approved by Dr. Hopkins, he was permitted to keep it as a mobility aid in general population. Further, Dr. Hopkins ultimately approved a wheelchair for Barnes' use in general population. That Barnes was not permitted his mobility aid *of choice*, a walker, does not establish an Eighth Amendment violation.

Barnes' walker was confiscated because it was not approved by the facility physician. In support of their motion for summary judgment, Warden Young and Director Schilling, neither of whom are medical doctors, state that they rely on the facility physician to determine whether a medical necessity exists for an inmate to have a mobility aid. (Aff. Young ¶ 5, Docket No. 32-1; Aff. Schilling ¶ 4, Docket No. 32-3) In Barnes' case, he was evaluated by the facility physician, who determined that his walker was not medically necessary. Since there was no medical order for a walker, defendants ultimately confiscated it; however, Barnes was permitted to use his cane, which Dr. Hopkins approved. The Fourth Circuit has held that non-medical personal may rely on the opinion of medical staff regarding the proper treatment of inmates. *Miltier*, 896 F.2d

---

[10] Warden Young asserts "there is no policy specifically banning the use of walkers at Pocohontas . . . ." (Aff. Young, ¶ 5, Docket No. 32-1)

at 854.[11] Thus, these defendants could rely on the decision by Dr. Hopkins with respect to Barnes' care and whether his condition required a walker. Consequently, I find that Barnes has failed to state a claim under the Eighth Amendment against Warden Young and Director Schilling, and I will grant their motion for summary judgment.

### B. Defendants Assistant Warden Meek, Nurse Yates and Unit Manager Eaton

Barnes claims that Assistant Warden Meek, Nurse Yates, and Unit Manager Eaton entered into an agreement on October 29, 2010 to deprive Barnes of food and medication for six days, until Dr. Hopkins could approve him for a wheelchair. (Docket No. 1, pp. 12–13) However, the grievances Barnes submitted with his complaint show that, at most, Barnes did not retrieve his medications or meals for two days following the alleged October 29, 2010 agreement, at which point he was transferred to medical housing on October 31, 2010.[12] Moreover, Barnes does not allege that Assistant Warden Meek, Nurse Yates, or Unit Manager Eaton prevented him from receiving his food or medication; he merely alleges that he could not retrieve his food or medication because he could not travel across the facility to the chow hall or pill line without a wheelchair. However, Dr. Hopkins had previously determined that Barnes' condition did not require a wheelchair and that a cane was a sufficient mobility aid. Assistant Warden Meek, Nurse Yates, and Unit Manager Eaton, who are not doctors, were entitled to rely

---

[11] Barnes' walker was initially removed at some point between March 2 and March 7, 2010, prior to his first visit with Dr. Hopkins. However, Barnes admits it was returned on March 7, 2010, the same day he filed an emergency grievance claiming his legs "could barely support [his] weight." (Docket No. 1, p. 8) Thereafter, on March 10, 2010, Dr. Hopkins evaluated Barnes and concluded that a walker was not needed. (Aff. Dr. Hopkins, ¶ 6, Docket No. 50-2) Thus, Barnes' walker was confiscated on March 11, 2010, only after Dr. Hopkins' finding that Barnes did not require a walker as a mobility aid. (Docket No. 1-5, p. 29)

[12] On October 30, 2010, Barnes submitted an emergency grievance stating he did not get his evening meal on October 29, 2010, or any meals or medication on October 30, 2010. (Docket No. 1-5, p. 10). On October 31, 2010, Barnes submitted an emergency grievance, indicating he had no "meals or medication all weekend." (Docket No. 1-5, p. 10) The response to this emergency grievance indicates that Barnes was moved to medical housing. (Aff. Yates ¶ 13, Docket No. 50-1)

on this decision by Dr. Hopkins. *See Miltier*, 896 F.2d at 848.[13] (Aff. Meek ¶ 4, Docket No. 32-2; Docket No. 32-1, p. 6; Aff. Yates ¶ 12, Docket No. 50-1)

Further, Barnes has not established that he had a serious medical need for an inmate pusher. *Farmer*, 511 U.S. at 831. Other than Barnes' claims that "every other wheelchair bound inmate" had an inmate pusher, Barnes has not established why he required another inmate to push his wheelchair, or that he was injured due to going without an inmate pusher for some unspecified amount of time.[14] (Docket No. 1, p. 13) While he states that he had difficulty moving through the snow without an inmate pusher, he does not say how often this occurred or that he was unable to retrieve his food or medication as a result.[15] Consequently, I find that Barnes fails to state a claim against Assistant Warden Meek and Unit Manager Eaton and will grant these defendants' motion for summary judgment.

### C. Dr. Hopkins and Nurse Yates

Barnes alleges that both Dr. Hopkins and Nurse Yates were aware of his lumbar spine problems and his difficulty and pain ambulating without a walker but still denied him access to a walker. Following my denial of the Medical Defendants' motion to dismiss, these Medical

---

[13] Although, Barnes claims he is diabetic, has mental health issues, and cannot miss medication or meals, he does not allege that he lost weight or suffered any diabetic or mental health emergency as a result of the missed meals and medications.

[14] Moreover, the grievances submitted by Barnes in support of his claim show that Barnes was assigned an inmate pusher at some point following Dr. Hopkins' November 3, 2010 approval of his wheelchair. However, that inmate was reassigned on December 20, 2010. While Unit Manager Eaton had indicated to Barnes that she was in the process of assigning him a new inmate pusher, the inmate she allegedly promised him was assigned to a different inmate. (Docket 1-4, p. 13) Neither party indicates whether Barnes was ultimately assigned a new inmate pusher before being transferred to a different facility on January 28, 2011.

[15] Barnes claim that he was "being extorted and demanded sexual favors to receive the assistance of having other inmates help [him] through the snow" (Docket No. 1, p. 13) fails to allege any personal acts or omissions against these defendants, and therefore does not state a claim under § 1983. *See Wright*, 766 F.2d at 850 (finding a defendant must have been personally involved in the allegedly unconstitutional action or omission to be liable in a § 1983 action)

Defendants submitted affidavits regarding their actions and treatment of Barnes, as well as Barnes' medical records from the time he was housed at Pocahontas.[16] This evidence establishes that Dr. Hopkins and Nurse Yates were not deliberately indifferent to Barnes' serious medical need and did not ignore Barnes' complaints about his pain and difficulty ambulating.

Specifically, Dr. Hopkins examined Barnes on March 10, 2010, eight days after his arrival at Pocahontas. At that time, Dr. Hopkins approved Barnes' use of a cane, but determined that he did not require a walker. Dr. Hopkins also requested an MRI of Barnes' lumbar spine, which occurred on June 10, 2010. On June 11, 2010, Dr. Hopkins reviewed the MRI results, referred Barnes to a neurosurgeon, and increased the dosage of his pain medication. Thereafter, Barnes was evaluated by a neurosurgeon on August 25, 2010, October 8, 2010, and November 12, 2010.[17] On November 3, 2010, Dr. Hopkins granted Barnes permission to use a wheelchair.

Clearly, Barnes would have preferred a walker to a cane or wheelchair. However, mere disagreement between an inmate and medical staff as to diagnosis or course of treatment does not, in and of itself, state a constitutional violation. *See Wright*, 766 F.2d at 849. Further, the fact that Barnes had previously been allowed to use a walker at a different correctional facility

---

[16] Dr. Hopkins, Nurse Yates and Nurse Osborne filed a reply brief arguing that the court should not consider Barnes' response to their motion for summary judgment because it was not timely filed. Defendants state that Barnes response was due on July 2, 2013, but was not filed until July 18, 2013. A review of the record shows that Barnes' signed the response on July 2, 2013, and indicated he gave the response to prison authorities on that date. Thus, according to the "prison mailbox rule," Barnes response was deemed filed on the date it was deposited in the prison mailing system, on July 2, 2013. *See Houston v. Lack*, 487 U.S. 266 (1988); *see also Lewis v. Richmond City Police Dep't*, 947 F.2d 733, 735 (4th Cir. Va. 1991).

[17] The notes from the November 12, 2010 Telemed examination indicate that Barnes walks without a limp and has good strength in his lower extremities. The neurosurgeon's impression from the MRI was "significant narrowing at L4 and L5" and lumbar stenosis. (Docket 50-1, p. 13) The neurosurgeon recommended epidural steroid injections to treat pain. There is a factual disagreement regarding whether Barnes received such injections while at Pocahontas, with Barnes denying Dr. Hopkins statement that he received epidural steroid injections on January 12, 2011. However, Barnes does not contest defendants contention that he was sent to a facility where he could receive epidural injections for his condition on January 26, 2011. (Aff. Yates ¶ 17, Docket No. 50-1, p. 3)

does not show that Dr. Hopkins was deliberately indifferent to a serious medical need.[18] While Barnes states he had difficulty walking due to his medical condition, he has not established that a walker was the only suitable mobility aid for his condition.[19] Moreover, once Dr. Hopkins determined that the wheelchair was not medically necessary, Nurse Yates could not overrule the doctor's order, and she was entitled to rely on the doctor's prescribed course of treatment. *See Chacon v. Ofogh*, No. 7:08cv46, 2008 WL 4146142, at *5 (W.D. Va. Sept. 8, 2008); *see also Miltier*, 896 F.2d at 854.

### IV. Section 1983 Claims Against Nurse Osborne

Barnes claims that Nurse Osborne removed him from his prison job in retaliation for his filing grievances against her.[20] To succeed on a § 1983 claim that prison officials retaliated against him, an inmate must show that his exercise of a constitutional right was a substantial factor motivating the retaliatory action. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). The inmate must present more than conclusory allegations of retaliation by alleging facts showing that his exercise of a constitutional right was a substantial factor motivating the retaliatory action. *See, e.g., Am. Civil Liberties Union v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993) (citing *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977) (requiring

---

[18] In his response to Medical Defendants' motion for summary judgment, Barnes claims he was allowed to use a walker at two prior Virginia correctional facilities between June 2008 and March 2010. (Docket No. 57, p. 7).

[19] Barnes states in his response to Medical Defendants' motion for summary judgment that between September 21, 2010 and October 31, 2010 he suffered several "'hypoglycemic attacks" due to lack of proper meals and medication," presumably resulting from his inability to walk to the mess hall and pill window, even with a cane. (Docket No. 57, p. 5) Barnes describes the attacks as "shaking, palpitations, faintness and hunger" and asserts that prolonged hypoglycemia may lead to permanent brain damage. (D. 57, p. 14–15). However, he does not specify when these attacks occurred, how many times they occurred, or that he suffered any permanent damage.

[20] Defendants assert that whether Barnes lost his job as an inmate pusher would have been determined by the Institutional Program Manager, David Hammond, and not Nurse Osborne. (Aff. Bandy ¶ 10, Docket 50-4)

plaintiff to show "a causal relationship between the protected expression and the retaliatory action"); *Wagner v. Wheeler*, 13 F.3d 86, 90–91 (4th Cir. 1993) (same). Mere "temporal proximity" between the inmate's protected activity and the official's allegedly retaliatory action "is simply too slender a reed on which to rest" a §1983 retaliation claim. *Wagner*, 13 F.3d at 91.

Barnes has presented no evidence, aside from his bald assertion, that the charge filed against him by Nurse Osborne had anything to do with any grievances he had filed. Nurse Osborne states in her affidavit that she reported Barnes to the Unit Manager after she saw him sitting and being pushed in the wheelchair belonging to the inmate he was assigned to push. She further states that she reported Barnes, not in retaliation, but because his actions were a "misuse of the wheelchair assigned to the disabled inmate." (Osborne Aff. ¶ 8, Docket 50-3, p. 2) Barnes concedes that he was sitting and being pushed in the wheelchair he was assigned to push.[21] (Docket No. 57, p. 17) Indeed, Barnes pleaded guilty to Nurse Osborne's charge.[22] (Aff. Bandy ¶¶ 4–7, Docket No. 50-4).

In light of the fact that Barnes has admitted he did precisely what Nurse Osborne alleged in her charge, Barnes has failed to show that Nurse Osborne retaliated against him for filing grievances. *See Adams*, 40 F. 3d at 75 (noting claims of retaliation are generally treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct.").

---

[21] Barnes claims that his back gave out when he was pushing the inmate's wheelchair and that the inmate let him use wheelchair and pushed him to medical. He also states he had permission to use the inmate's wheelchair as a walker. However, the Nurse Osborne cited him for being pushed in the other inmate's wheelchair, not for using it as a walker.

[22] Barnes accepted a "penalty offer" which involves an admission of guilt.

## V. Conclusion

For the reasons stated, I grant defendants' motions for summary judgment.

The Clerk of the Court is directed to send copies of this memorandum opinion and the accompanying order to the parties.

**ENTER**: This $\underline{13\text{th}}$ day of September, 2013.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE